FILED _____ ENTERED
LODGED _____ RECEIVED

NOV 18 2002

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

Q-PHARMA, INCORPORATED,

                        Plaintiff,

            v.

THE ANDREW JERGENS
CORPORATION, INCORPORATED,

                        Defendant.

No. C01-1312P

ORDER DENYING
ATTORNEYS' FEES UNDER 35
U.S.C. § 285 AND GRANTING
SUMMARY JUDGMENT ON
ANTITRUST IMMUNITY

Plaintiff Q-Pharma, Inc. ("Q-Pharma") originally filed this lawsuit to enforce its patent related to therapeutic application of "Coenzyme Q10" to skin. Defendant The Andrew Jergens Corporation, Inc. ("Jergens") filed a counterclaim alleging attempted monopolization in violation of antitrust laws. The present motions address two issues: whether a less-than-ideal yet adequate pre-filing investigation can justify an award of attorneys' fees under the patent statute, and whether and under what circumstances an attempt to enforce a patent is immune from antitrust liability.

This matter comes before the Court on defendant's motion for attorneys' fees pursuant to 35 U.S.C. § 285, (Dkt. No. 87), and plaintiff's motion for summary judgment on antitrust immunity. (Dkt. No. 106). Having considered all materials filed by the parties, and having reviewed the record as a whole, the Court DENIES defendant's motion for attorneys' fees because it finds that this is not an "exceptional case," as this litigation was not vexatious, unjustified, frivolous, or undertaken in bad faith on the part of the plaintiff. Likewise, the

ORDER DENYING ATTORNEYS' FEES
AND GRANTING SUMMARY JUDGMENT– 1

1   Court GRANTS plaintiff's motion for summary judgment on antitrust immunity because it

2   finds that the filing and maintenance of the suit was not "objectively baseless," and did not

3   constitute "sham" litigation.  Finally, defendant's pending motion for reconsideration, (Dkt.

4   No. 115), of this Court's prior discovery order is DENIED.

5                                          **BACKGROUND**

6          A detailed account of the factual and procedural background of the case is set forth

7   below in order to provide an understanding of how the present motions came before the

8   Court.

9          Plaintiff Q-Pharma holds U.S. Patent No. 4,654,373 ("the '373 patent).  The claims in

10  the '373 patent read as follows:

11         1.    A method of therapeutically treating impaired or damaged tissue in
                 humans and animals which comprises topically administering to such
12               tissue a composition comprising **as the principal active ingredient** a
                 **therapeutically effective** amount of Coenzyme Q-10 . . . in admixture
13               with a pharmaceutically acceptable carrier.

14         2.    A method according to claim 1 in which the amount of Coenzyme Q-10
                 in said composition is .1%-10% by weight.
15
           3.    A method according to claim 1 in which the amount of Coenzyme Q-10
16               in said composition is .0001-.1% by weight.

17         4.    A method according to claim1 in which the pharmaceutically acceptable
                 carrier is olive, peanut or soybean oil.
18
           5.    A method according to claim 1 in which the composition is in the form
19               of a paste, cream, ointment, gel, lotion or unguent.

20  '373 patent (emphasis added).

21         After Q-Pharma obtained the '373 patent, defendant Jergens began marketing "Curel

22  Age-Defying Therapeutic Moisturizing Lotion with Coenzyme Q-10."  The labeling of this

23  product clearly suggests that Coenzyme Q-10 is an active ingredient.  For example, the label

24  of the product reads in part as follows:

25

26
    ORDER DENYING ATTORNEYS' FEES
    AND GRANTING SUMMARY JUDGMENT– 2

1
2
3
4
5

> Curel Age Defying Therapeutic Lotion with Coenzyme Q10, combines the superior moisturizing formula of Dermatologist recommended dry skin lotion with Coenzyme Q-10. Coenzyme Q10 is a naturally occurring anti-oxidant found in the skin that helps defend against the visible signs of aging. Q10 levels in the skin begin to diminish with age. Curel Age Defying with Q10 helps to restore skin's natural elasticity revealing visibly healthier, younger looking skin. Curel Age Defying Therapeutic Lotion with Coenzyme Q10 is clinically proven to work three ways to visibly improve the look and feel of skin.

6  Maksimoski Decl. in Supp. of Jergens' Mot. for Summ. J. of Non-Infringement, Ex. B.

7  Although Q-Pharma's attorneys conducted a careful claims construction analysis before

8  filing suit, it is undisputed that no testing of the product was done in order to ascertain the

9  products' ingredients.

10      In response to Q-Pharma's litigation, Jergens brought four counterclaims.  Three of

11  these claims were for declaratory judgment on the patent, and one was a claim for damages

12  for alleged antitrust violations.

13      During the course of discovery, Q-Pharma repeatedly demanded information from

14  Jergens regarding the contents of the Curel product.  Mar Decl. in Supp. of Pl.'s Mot. to

15  Compel, Exs. B, D-G.  Ultimately, Q-Pharma brought a motion to compel.  Rather than

16  respond to the motion, Jergens moved for summary judgment of non-infringement.  In

17  support of its motion, Jergens disclosed, for the first time, that despite the logical

18  implications of its advertising, its product contained a minuscule amount of Coenzyme Q-10

19  (no more than .00005% by weight).  Maksimoski Decl. at 3.

20      In light of that newly-disclosed information, Q-Pharma elected to abandon its suit.  It

21  moved for voluntary dismissal with prejudice, and also filed two separate documents wherein

22  it promised not to sue in the future for the production or consumption of the Curel product.

23  Finding that the Court had been divested of Article III jurisdiction over the declaratory

24  judgment actions, the Court then dismissed all but the antitrust counterclaim.

25

26

ORDER DENYING ATTORNEYS' FEES
AND GRANTING SUMMARY JUDGMENT– 3

After dismissal of the complaint and of the majority of the counterclaims, Jergens served its Rule 11 motion on plaintiff, insisting that the Reply to the counterclaims be amended. With the exception of that portion of the Reply which addressed the antitrust counterclaim, the Reply was for the most part by that time a moot document. After the 21-day safe harbor time had elapsed, Jergens served its motion on the Court.

Jergens made the following arguments: 1) Q-Pharma knew prior to bringing suit against Jergens, or reasonably should have known, that Coenzyme Q10 was not the principal active ingredient in the Curel product; and 2) Q-Pharma was aware, prior to bringing suit against Jergens, that the '373 patent was invalid. Motion for Sanctions, (Dkt. No. 69). This Court denied Jergens' motion on all grounds. Specifically, the Court found that the motion was untimely, that the claim of notice of invalidity had no merit, and that the pre-filing investigation, although not ideal, was sufficient to overcome the motion for sanctions. The Court stated that while the "plaintiff's claims were questionable, they were not wholly improbable." Id. at 6. The Court also relied on defendant's dilatory conduct during discovery, noting that Jergens itself contributed to the expense and inconvenience of the litigation by not promptly disclosing the minuscule amount of Coenzyme Q10 in its product. Id.

During the pendency of the Rule 11 sanctions motion, Jergens sought discovery to support its antitrust counterclaim. Jergens eventually filed a motion to compel compliance with a subpoena duces tecum seeking attorney-client privileged information related to Q-Pharma's pre-filing investigation. Jergens argued that in defending the Rule 11 sanctions motion, Q-Pharma had waived privilege to certain documents. The Court denied the motion to compel, holding that there was no implied waiver of the attorney client privilege because Q-Pharma did not make any affirmative act by responding to the Rule 11 sanctions motion

ORDER DENYING ATTORNEYS' FEES
AND GRANTING SUMMARY JUDGMENT– 4

1  and because no privileged communications were placed at issue. The Court also noted that

2  Rule 11 must not be used as a discovery device.

3       Also during the pendency of the Rule 11 sanctions motion, Jergens brought the

4  present motion for attorneys' fees under Section 285 of the patent statute. 35 U.S.C. § 285.

5  That motion asserts the same arguments for attorneys' fees under the patent statute as did the

6  motion for Rule 11 sanctions. Specifically, Jergens argues that Q-Pharma should have

7  known that Jergens' product did not infringe the patent, and that Q-Pharma should have

8  known that its patent was invalid. § 285 Motion at 3, 8. Jergens asserts that this is an

9  "exceptional case" constituting "vexatious or unjustified litigation, [or] frivolous suit," as

10 required for an award of attorneys' fees under the statute. Id. at 2-3. Q-Pharma responds by

11 arguing that Jergens has not met its burden of showing by clear and convincing evidence that

12 Q-Pharma was acting with actual malice or was grossly negligent in filing or maintaining the

13 lawsuit. Opp. at 3.

14      After the Court denied Rule 11 sanctions, Q-Pharma brought a motion for summary

15 judgment on antitrust immunity. In that motion, Q-Pharma argues that Jergens' remaining

16 counterclaim should be dismissed, given the Court's ruling on the Rule 11 motion, because

17 Jergens' cannot show that the patent action constitutes "sham litigation" as required for a

18 patent enforcement antitrust action. Pl.'s Summ. J. Mot. at 1-2. Specifically, Q-Pharma

19 asserts that its suit was not "objectively baseless," the first part in a two-part test for

20 determining "sham litigation" set forth in Professional Real Estate Investors, Inc. v.

21 Columbia Pictures Indus., Inc., 508 U.S. 49, 60-61 (1993).

22      Instead of responding to the motion for summary judgment, Jergens filed an

23 "opposition" that was actually an argument as to why discovery should be allowed into

24 documents listed on Q-Pharma's privilege log. Jergens submits a Rule 56(f) declaration

25 detailing the documents it says it needs in order to defend the summary judgment motion.

26

ORDER DENYING ATTORNEYS' FEES
AND GRANTING SUMMARY JUDGMENT– 5

1  Jergens simultaneously filed a motion for reconsideration of the Court's September 30, 2002,

2  order denying its motion to compel discovery of certain documents based on attorney-client

3  privilege waiver.   Jergens bases its motion on "new facts," alleging  that even if privilege

4  was not waived in defending the Rule 11 motion, it was waived when Q-Pharma brought its

5  motion for summary judgment, and therefore discovery of the otherwise privileged

6  documents should be compelled. Mot. for Recon. at 1-2. Q-Pharma responds by stating that

7  the motion for summary judgment does not even reference material that Jergens says waives

8  the privilege, but rather only cites to this Court's order denying sanctions. Q-Pharma also

9  argues that in failing to respond to Q-Pharma's motion for summary judgment, Jergens in

10  effect admitted that it could not meet its burden of showing that the litigation was

11  "objectively baseless."

12  <center>**ANALYSIS**</center>

13  1.      Motion for Attorneys' Fees Under 35 U.S.C. § 285

14          In its § 285 motion, Jergens argues that this is an "exceptional case" justifying an

15  award of attorneys' fees on two grounds.  First, Jergens asserts that Q-Pharma should have

16  tested Jergens' product prior to filing suit.  § 285 Mot. at 4.  According to Jergens, such a test

17  would have revealed that the presence of Coenzyme Q10 was minuscule, not a

18  "therapeutically effective amount," and that Jergens' product was therefore non-infringing.

19  Id. at 4-5.  Second, Jergens argues, as it did in its motion for sanctions, that Q-Pharma was on

20  notice that its patent was invalid.  Id. at 8.  Based on the following analysis, Jergens' motion

21  for attorneys' fees is denied.

22          Under 35 U.S.C. § 285, a court may award attorneys' fees to a party to an

23  infringement suit if the court finds by clear and convincing evidence that the case is

24  "exceptional."  Interspiro USA, Inc. v. Figgie Int'l, Inc., 18 F.3d 927, 933 (Fed. Cir. 1994).

25  "Among the types of conduct which can form a basis for finding a case exceptional are

26

ORDER DENYING ATTORNEYS' FEES
AND GRANTING SUMMARY JUDGMENT– 6

1   willful infringement, inequitable conduct before the [Patent and Trademark Office],

2   misconduct during litigation, vexatious or unjustified litigation, or frivolous suit." Hoffman-

3   La Roche, Inc. v. Invamed Inc., 213 F.3d 1359, 1365 (Fed. Cir. 2000) citing Beckman

4   Instruments, Inc. v. LKB Produkter AB, 892 F.2d 1547, 1551 (Fed. Cir. 1989). "In the case

5   of awards to prevailing accused infringers . . . 'exceptional cases' are normally those of bad

6   faith litigation or those involving fraud or inequitable conduct by the patentee in procuring

7   the patent." Id. A case may be exceptional if a party acts with actual wrongful intent or with

8   gross negligence. Machinery Corp. of America v. Gullfiber AB, 774 F.2d 467, 473 (Fed.

9   Cir. 1985). "The gross negligence standard has been defined as requiring willful, wanton, or

10  reckless misconduct, or evidence of utter lack of all care." Id. (internal quotations omitted).

11  A finding of "exceptional case" is one of fact that is committed to the sound discretion of the

12  trial court. Beckman Instruments, 213 F.3d at 1551.

13          a.    Pre-filing Inquiry

14          The standards used to evaluate granting sanctions under Rule 11 and attorneys' fee

15  awards under § 285 for inadequate pre-filing inquiries are quite similar, though the burden of

16  persuasion appears to be higher under § 285 than under Rule 11. In cases where the Federal

17  Circuit has analyzed infringement actions under both Rule 11 and § 285, the court has arrived

18  at the same result under both standards. Hoffman-La Roche, Inc. v. Invamed Inc., 213 F.3d

19  1359 (Fed. Cir. 2000); Cambridge Products Ltd. v. Penn Nutrients, Inc., 962 F.2d 1048 (Fed.

20  Cir. 1992).

21          In Hoffman-La Roche, an accused infringer brought a motion for sanctions under Rule

22  11 for filing a baseless suit without proper pre-filing investigation, and for attorneys' fees

23  under 35 U.S.C. § 285 as an "exceptional case," after the plaintiff dismissed its complaint.

24  215 F.3d at 1360. The defendant alleged that the suit was baseless because the plaintiff had

25  not first concluded that the defendant's process of producing a drug actually infringed its

26

ORDER DENYING ATTORNEYS' FEES
AND GRANTING SUMMARY JUDGMENT– 7

1  patent. Id. at 1364.  The court found that the plaintiff had done all that it could have done by

2  requesting the defendant to produce its process for evaluation prior to filing suit.  Id.

3  Therefore, the court concluded that the plaintiff's "initial claim of infringement was not

4  unreasonable in light of the available information at the time of filing."  Id. at 1365.  The

5  court then analyzed the same allegations under the patent statute, and concluded that there

6  was no evidence that the claims were pursued in bad faith.  Id. at 1366.

7      Similarly, in Cambridge Products, an accused infringer moved for sanctions and

8  attorneys' fees, arguing that the plaintiff had not done an appropriate investigation as to

9  whether plaintiff's patented method of making a mold inhibitor was infringed by the

10  defendant.  962 F.2d at 1050.  Defendant in that case asserted that "a simple phone call" to

11  the defendant prior to filing would have revealed that the defendant's method was not the

12  same.  Id.  The Federal Circuit held that Rule 11 sanctions were not warranted because the

13  pre-filing investigation, which included chemical testing of the product, was reasonable.  Id.

14  In denying the § 285 motion, the court found that the plaintiff had not proceeded in bad faith.

15  Id. at 1051.

16      The Court finds compelling the Federal Circuit's use of a "bad faith" standard in

17  determining the "exceptional case" in the context of the accused infringer.  These cases

18  demonstrate that if the standards under Rule 11 and § 285 are different, the required showing

19  "bad faith" under the patent statute is greater than that of "baseless suit" under Rule 11.

20  While Rule 11 evaluates the pre-filing investigation to determine whether it is sufficient, §

21  285 and the case law interpreting it require that the litigation be undertaken in bad faith, at

22  least in the context of the allegedly wrongfully accused infringer.  At least one court has

23  explicitly found the § 285 standard to be higher.  Ultra-Temp Corp. v. Advanced Vacuum

24  Systems, Inc., 189 F.R.D. 17, 21(D. Mass. 1999) (holding that even though the plaintiff had

25  violated Rule 11, attorneys' fees were not justified under § 285, stating, "failure to conduct

26

ORDER DENYING ATTORNEYS' FEES
AND GRANTING SUMMARY JUDGMENT– 8

1   an adequate investigation, without more, is not grounds for finding a case to be 'exceptional'
2   under 35 U.S.C. § 285.")  Cf. View Eng'g v. Robotic Vision Sys., 208 F.3d 981, 986 (Fed.
3   Cir. 2000) (granting Rule 11 sanctions for an inadequate pre-filing investigation that included
4   only an analysis of the competitor's advertising and the attorney's knowledge of the patents
5   held, and placing great emphasis on the lack of an infringement analysis prior to filing the
6   claims.)

7           The case before the Court presents the issue of what is adequate versus what is "best
8   practice."  Q-Pharma's pre-filing investigation, while not ideal, simply does not rise to the
9   level of bad faith litigation or gross negligence required for an award of attorneys' fees under
10  § 285.  As this Court stated in its prior order, Q-Pharma's pre-filing analysis included
11  investigation of Jergens' advertising, as well as a claims construction.  Order on Rule 11
12  Sanctions at 4.  To test Jergens' product prior to filing would have been preferable, but the
13  Court finds that Q-Pharma's actions were adequate.

14          Q-Pharma's claims construction interpreting its patent as reading on a broad range of
15  concentrations was reasonable.  Jergens argues that Q-Pharma should have interpreted its
16  patent much more narrowly, specifically that the term "therapeutically effective amount"
17  requires an amount of Coenzyme Q10 of at least 0.1% by weight, an amount disclosed in the
18  specification of the patent.  § 285 Mot. at 4.  Yet claim 3 of the patent covers amounts of
19  Coenzyme Q10 for 0.0001-0.1% by weight.  '373 patent, 8:32-34.  Claim 1 contains no
20  numerical limitation at all.  Id. at 8:22-28.  Jergens' interpretation would not only require a
21  reading that would make claim 3 internally inconsistent and meaningless, it would
22  improperly import a limitation from the specification into both claims 1 and 3.  Toro Co. v.
23  White Consol. Indus. Inc., 199 F.3d 1295, 1301 (Fed. Cir. 1999) ("It is well established that
24  the preferred embodiment does not limit broader claims that are supported by the written
25  description.").  The Court declines to read a limitation of "0.1% by weight" into the claim

26

ORDER DENYING ATTORNEYS' FEES
AND GRANTING SUMMARY JUDGMENT– 9

1  language. Thus, Q-Pharma's conclusions about the scope of its patent were not wholly

2  improbable.

3      Once Q-Pharma construed the claim elements of the '373 patent, Q-Pharma relied on

4  Jergens advertising in determining what was in the product. Jergens clearly marketed its

5  product with the intent to create the impression that Coenzyme Q-10 was present in

6  therapeutically effective amounts and was either the principle active ingredient or was at

7  least one of two possible active ingredients. Q-Pharma was not unreasonable in concluding

8  that Jergens' product infringed its patent as it had interpreted the claims.

9      Thus, the Court can not find that Q-Pharma's filing was "grossly negligent."

10  Machinery Corp. of America, 774 F.2d at 473. Further, there is no evidence in the record

11  indicating that Q-Pharma acted in "bad faith" in pursuing its claims. Hoffman-La Roche,

12  213 F.3d at 1365. Even if an award of attorneys' fees were appropriate in this matter, Q-

13  Pharma's responsibility to pay such fees would clearly end at the moment that the first set of

14  interrogatories issued. Jergens itself prolonged the litigation by failing to disclose the Curel

15  product's formula while simultaneously arguing that the formula was what kept the product

16  outside the claim language of the '373 patent. As soon as Jergens provided information

17  regarding the true content of its product, Q-Pharma dismissed its claims with prejudice.

18      b.    Prior Notice of Invalidity

19      Jergens also argues that this is an "exceptional case" because Q-Pharma was put on

20  prior notice that its patent was invalid. As in its Order denying Rule 11 sanctions, this Court

21  finds this argument without merit. Jergens sole asserted evidence that Q-Pharma was on

22  notice of invalidity is a letter from a competitor alleging the invalidity of the patent.  § 285

23  Motion, Ex. EE. This does not prove invalidity or notice thereof; rather, it merely shows a

24  dispute between a patent holder and an accused infringer. On the other hand, Q-Pharma has

25  successfully licensed the '373 patent to more than 10 companies. Opp. at 10, Hess Decl. at 1.

26

ORDER DENYING ATTORNEYS' FEES
AND GRANTING SUMMARY JUDGMENT– 10

1    These licenses gave Q-Pharma more than adequate reason to believe in the validity of its

2    patent.

3           Based on the foregoing reasoning, the Court finds in its sound discretion that Jergens

4    has failed to meet its burden of showing clear and convincing evidence that this case is

5    "exceptional."  The motion for an award of attorneys' fees under § 285 is therefore denied.

6    The Court does not reach the issue of whether Q-Pharma and its attorneys would be jointly

7    and severally liable for attorneys' fees awarded under § 285 as argued by Jergens.

8    2.     Motion for Summary Judgment on Antitrust Immunity

9           Jergens asserts in its counterclaim that Q-Pharma's lawsuit is in violation of the

10   Sherman Act, 15 U.S.C. § 1 et seq., and specifically § 2 as an "attempt to monopolize."  Q-

11   Pharma brings the present motion for summary judgment dismissing the counterclaim on the

12   ground that it is entitled to antitrust immunity in enforcing its patent.

13          "The bringing of a lawsuit to enforce legal rights does not of itself constitute violation

14   of the antitrust laws or patent misuse; there must be bad faith and improper purpose in

15   bringing the suit, in implementation of an illegal restraint of trade.  Glaverbel Societe

16   Anonyme v. Northlake Marketing and Supply, Inc., 45 F.3d 1550, 1558 (Fed. Cir. 1995).

17   The general rule for antitrust actions stemming from patent infringement lawsuits was

18   enunciated in In re Independent Service Organizations Antitrust Litigation, 203 F.3d 1322,

19   1326 (Fed. Cir. 2000), as follows:

20          [A] patent owner who brings suit to enforce the statutory right to exclude
            others from making, using, or selling the claimed invention is exempt from the
21          antitrust laws, even though such a suit may have an anticompetitive effect,
            unless the infringement defendant proves one of two conditions. . . . First, he
22          may prove that the asserted patent was obtained through knowing and willful
            fraud . . . Or he may demonstrate the infringement suit was a mere sham to
23          cover what is actually no more than an attempt to interfere directly with the
            business relationships of a competitor.

24

25

26

1    Id. (internal citations omitted).  In order to show that litigation was a "sham," an antitrust

2    claimant must pass a two-part test.  Id. citing Professional Real Estate Investors, Inc. v.

3    Columbia Pictures Indus., Inc., 508 U.S. 49, 60-61 (1993).

4          First, the lawsuit must be objectively baseless in the sense that no reasonable
           litigant could realistically expect success on the merits.  If an objective litigant
5          could conclude that the suit is reasonably calculated to elicit a favorable
           outcome, the suit is immunized under Noerr, and an antitrust claim premised on
6          the sham exception must fail.  Only if challenged litigation is objectively
           meritless may a court examine the litigant's subjective motivation.  Under this
7          second part of our definition of sham, the court should focus on whether the
           baseless lawsuit conceals "an attempt to interfere directly with the business
8          relationships of a competitor," through the "use [of] the governmental process -
           as opposed to the outcome of that process - as an anticompetitive weapon."

9
    Professional Real Estate, 508 U.S. at 60-61 (citations omitted).  The first step requires a legal
10
    determination.  Id. at 61.  ("This two-tiered process requires the plaintiff to disprove the
11
    challenged lawsuit's legal viability before the court will entertain evidence of the suit's
12
    economic  viability.") (emphasis in original).  Thus, failure to show that a suit is objectively
13
    baseless eliminates any "genuine issue of material fact," and summary judgment is
14
    appropriate as a matter of law.  Id. at 65-66; Fed. R. Civ. P. 56(c).
15
          Q-Pharma argues that the Court implicitly held that its suit was not "objectively
16
    baseless" when it denied the motion for Rule 11 sanctions.  Specifically, the Court found that
17
    Q-Pharma "did not act unreasonably" in bringing its action, that the claim construction "was
18
    not completely without logic," and that the merits of the claims "were not wholly
19
    improbable."  See Order Denying Rule 11 Sanctions.  Q-Pharma argues that these findings at
20
    least imply that its actions were not "objectively baseless."   Because the first part of the
21
    Professional Real Estate analysis requires that the lawsuit be "objectively baseless" prior to
22
    investigation into subjective intent, Q-Pharma argues that the antitrust claim should be
23
    dismissed without further investigation.
24

25

26
    ORDER DENYING ATTORNEYS' FEES
    AND GRANTING SUMMARY JUDGMENT– 12

1    Jergens elected not to respond to the motion for summary judgment. Instead, it filed

2   an "opposition" that was actually an argument as to why discovery should be allowed into

3   documents both listed on Q-Pharma's privilege log and documents Jergens thinks Q-Pharma

4   is "hiding." Opposition at 5. Jergens also submitted a Rule 56(f) declaration as to the

5   documents it says it needs in order to defend the summary judgment motion.

6    Summary judgment on behalf of Q-Pharma is appropriate for several reasons. First, in

7   an objective analysis of the "baselessness" of the suit the Court will not look at what Q-

8   Pharma's attorneys actually did or thought before filing and while maintaining the suit.

9   Instead, the Court evaluates the suit on the basis of the objective and undisputed evidence,

10   specifically the patent itself, the prosecution history, and Jergens' advertising, to determine

11   whether an reasonable litigant could reasonably expect success on the merits based on that

12   evidence. Wholly independent of any attestation of Q-Pharma's attorneys, the Court finds

13   that in light of Jergens' advertising touting the therapeutic effects of Coenzyme Q10 in its

14   product, and given a reasonable interpretation of the claim language and the prosecution

15   history, Q-Pharma's decision to proceed with the lawsuit was not objectively baseless.

16    The claim language supports a reading covering a broad range of concentrations of

17   Coenzyme Q10. Independent claim 1 of the '373 patent covers a method of therapeutically

18   treating skin through topical administration of Coenzyme Q10 in a therapeutically effective

19   amount. '373 patent, 8:22-28. While it is true that the prosecution history reveals that the

20   phrase "effective amount" was changed to "therapeutically effective amount" in order to

21   overcome a prior art objection, (See June 24, 1986 Amendment, Haas Decl. in Supp. of Mot.

22   for Summ. J. of Non-Infringement, Ex. A, Section B, Tab 11), the exact quantity that

23   constitutes therapeutic effectiveness is not specified. Given that claim 3 covers amounts of

24   Coenzyme Q10 down to 0.0001 % by weight and that this claim was accepted by the Patent

25   and Trademark Office, the Court presumes that the phrase "therapeutically effective amount"

26

1    includes concentrations at least as low as 0.0001% by weight.  It is not unreasonable, and

2    certainly not baseless, to conclude that a product that touts the therapeutic effects of

3    Coenzyme Q-10 ("clinically proven . . . to visibly improve the look and feel of skin") would

4    at least contain concentrations as high as those specified in the patent's dependent claims.

5    Therefore, the Court cannot say that "no reasonable litigant" would realistically expect

6    success on the merits.

7         Second, this Court's previous order denying Rule 11 sanctions implicitly held that, at

8    a minimum, Q-Pharma's actions in filing and maintaining the law suit were not objectively

9    baseless.  Specifically, the Court found that Q-Pharma "did not act unreasonably" in bringing

10   its action, that the claim construction "was not completely without logic," and that the merits

11   of the claims "were not wholly improbable."  See Order Denying Rule 11 Sanctions.  These

12   findings became the law of the case, and this Court sees no compelling reason to undo its

13   prior order.  That order indeed implicitly held that Q-Pharma's suit was not objectively

14   baseless.

15        Third, in refusing to respond to Q-Pharma's motion, Jergens in effect admitted that

16   there was no issue of material fact as to whether Q-Pharma's suit was objectively baseless.

17   As justification for its discovery requests, Jergens attempts to raise "a fact issue as to the

18   appropriateness of Q-Pharma's and its attorneys' conduct."[1]  Opp. at 3.  Yet in an objective

19   analysis, the appropriateness of the attorneys' conduct is not yet at issue.  Only after a

20   determination that the suit itself was objectively baseless would such subjective conduct be

21   analyzed for anticompetitive intent.  Professional Real Estate, 508 U.S. at 60-61.

22

23

24        [1]Jergens makes several references to Q-Pharma's "repeated" assertions to the Court that "any amount"
     of Coenzyme Q-10 would infringe the patent.  Opposition at 4, 56(f) Declaration at 4.  Yet the only cited
     reference regarding this assertion appears to be a statement made by Q-Pharma in its opposition to a motion to
25   transfer venue in which it stated that "any topical administration" of Coenzyme Q-10 would infringe the patent.
     Opp. to Mot. to Transfer at 5.

26

     ORDER DENYING ATTORNEYS' FEES
     AND GRANTING SUMMARY JUDGMENT– 14

1    Finally, given the Court's finding that the suit was not objectively baseless, the Court

2  declines to allow discovery pursuant to the 56(f) declaration.  Any discovery would only lead

3  to evidence of Q-Pharma's subjective actions and intent in its decision to file its lawsuit.  In

4  order to obtain a Rule 56(f) continuance, Jergens must have shown that "additional discovery

5  would uncover specific facts which would preclude summary judgment." Maljack

6  Productions v. Good Times Home Video Corp., 81 F.3d 881, 888 (9th Cir. 1996). The Court

7  finds that there is nothing sought in the 56(f) declaration submitted by Jergens that would

8  preclude summary judgement.  Given the patent's claim language, its prosecution history,

9  and the evidence of Jergens' advertising, the filing and maintenance of the lawsuit was not

10  objectively baseless, and the inquiry ends there.  Thus this was not "sham" litigation, and

11  Jergens' antitrust counterclaim is dismissed.

12  3.    Motion for Reconsideration

13    In conjunction with its "opposition" to the motion for summary judgment on antitrust

14  immunity and concurrently filed Rule 56(f) declaration, Jergens asks this Court to reconsider

15  its order denying the motion to compel attorney-client privileged documents.  Jergens argues

16  that in bringing its motion for summary judgment, Q-Pharma has now affirmatively placed its

17  attorneys' actions at issue, and therefore discovery should be allowed.  Specifically, Jergens

18  states that Q-Pharma relied on this Court's order denying Rule 11 sanctions, which in turn

19  relied on declarations of Q-Pharma's attorneys, and therefore the privilege has been waived.

20    "Motions for reconsideration are disfavored."  Local Rule CR(7)(h)(1).  Such motions

21  will ordinarily be denied "in the absence of a showing of manifest error in the prior ruling or

22  a showing of new facts or legal authority which could not have been brought to [the Court's]

23  attention earlier with reasonable diligence."  Id.

24    Jergens in its pleadings asserts that "new facts" exist, specifically that Q-Pharma has

25  by its actions "expressly" waived privilege.  Opp. to Mot. for Summ. J. at 2.  Q-Pharma has

26

ORDER DENYING ATTORNEYS' FEES
AND GRANTING SUMMARY JUDGMENT– 15

1  done no such thing. An "express" action is defined as an action "clearly and unmistakably

2  communicated; directly stated." Black's Law Dictionary, at 601 (7th ed. 1999). Q-Pharma

3  makes no statement in any pleading that it waives attorney-client privilege. Therefore,

4  standards for implied waiver of attorney client privilege apply.

5        As stated in this Court's prior order, a three-part test is used to determine generally

6  whether attorney-client privilege has been impliedly waived. Home Indem. Co. v. Lane

7  Powell Moss and Miller, 43 F.3d 1322, 1326 (9th Cir. 1995), citing Hearn v. Rhay, 68 F.R.D.

8  574, 581 (E.D. Wash. 1975).

9        Under Hearn, an implied waiver of the attorney-client privilege occurs when
   (1) the party asserts the privilege as a result of some affirmative act, such as
10   filing suit; (2) through this affirmative act, the asserting party puts the
   privileged information at issue; and (3) allowing the privilege would deny the
11   opposing party access to information vital to its defense. In Hearn, an
   overarching consideration is whether allowing the privilege to protect against
12   disclosure of the information would be "manifestly unfair" to the opposing
   party.

13
   Home Indem. Co., 43 F.3d at 1326 (internal citations omitted).
14
        Here, Q-Pharma put no privileged information at issue. Q-Pharma does not even
15
   reference the declarations in opposition to the Rule 11 sanctions motion. Rather, it only cites
16
   this Court's order denying sanctions. The Court holds that a party or its attorneys simply
17
   cannot waive privilege by citing an order of the Court. Jergens chose to bring its Rule 11
18
   motion first and in doing so created a record for Q-Pharma to reference. Furthermore,
19
   Jergens does not need this information for anything "vital to its defense" because the only
20
   remaining claim is its antitrust claim against Q-Pharma.
21
        Finally, because the first step in the antitrust analysis is that of objective baselessness,
22
   Jergens stated need for its discovery related to its antitrust counterclaim is premature. Only
23
   after a determination that a suit is objectively baseless do the subjective motivations of the
24
   attorneys come into play. Professional Real Estate, 508 U.S. at 60-61. Just as a party cannot
25

26

ORDER DENYING ATTORNEYS' FEES
AND GRANTING SUMMARY JUDGMENT– 16

1  obtain attorney-client privileged information by bringing a Rule 11 sanctions motion, neither

2  should it be able to pierce the privilege by simply asserting an antitrust counterclaim without

3  first establishing that the suit was objectively baseless.

4

5                                    **CONCLUSION**

6       Based on the foregoing analysis, defendant's motion for attorneys' fees under § 285 of

7  the patent statute is DENIED because this case is not "exceptional" as that term has been

8  interpreted by the Federal Circuit. The plaintiff's motion for summary judgment on antitrust

9  immunity is GRANTED because the Court finds that Q-Pharma's filing and maintenance of

10 the suit was not "objectively baseless," and Q-Pharma is therefore immune from antitrust

11 liability arising from its attempt to enforce its patent.  Jergens' antitrust counterclaim is

12 hereby dismissed. Defendant's motion for reconsideration of this Court's previous discovery

13 order is DENIED.

14

15      The clerk of the Court is directed to distribute a copy of this Order to all counsel of record.

16      Dated this _**18**_ day of _**Nov.**___, 2002.

17

18                                        _____
                                         Marsha J. Pechman
19                                       United States District Judge

20

21

22

23

24

25

26

ORDER DENYING ATTORNEYS' FEES
AND GRANTING SUMMARY JUDGMENT– 17